**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

| | | |
|---|---|---|
| KATHLEEN MEEGHAN WALSH, | : | |
| Plaintiff, | : | |
| -against- | : | 25-CV-6231 (OTW) |
| FITCH SOLUTIONS INC., et al., | : | **OPINION AND ORDER** |
| Defendants. | : | |

-----------------------------------------------------------x

**ONA T. WANG**, **United States Magistrate Judge**:

## I. INTRODUCTION

Now before the Court is Defendants' Fitch Solutions, Inc. and Fitch Group, Inc. ("Defendants") motion to dismiss Plaintiff's Complaint. (ECF 1). Plaintiff brings 29 different counts under the following federal and state laws: Age Discrimination in Employment Act 29 U.S.C. § 621 et. seq. (the "ADEA"), Title VII, the Americans with Disabilities Act (the "ADA"), the Family Medical Act 29 U.S.C. § 2615(a)(2) ("FMLA"), New York Executive Law § 296, New York City Administrative Code, the Connecticut Fair Employment Practices Act ("CFEPA"), New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), New York Labor Law, Connecticut General Statute § 31-51q, Connecticut General Statute § 31-49, the Connecticut Paid Leave Act, Negligent Infliction of Emotional Distress ("NIED), and Intentional Infliction of Emotional Distress ("IIED"). For the following reasons, Defendants' motion to dismiss is **GRANTED.** Plaintiff's opposition requests leave to amend but Plaintiff did not attach a

proposed amended complaint. (Pl's. Mem. Of Law., ECF 33 at 39). If Plaintiff wishes to amend her Complaint, she must file a motion to amend by **October 23, 2026,** and attach her proposed amended complaint.

## II. BACKGROUND[1]

### A. Factual History

#### *1. Plaintiff's biographical information*

Plaintiff is a female resident of Darien, Connecticut whose birth date is July 30, 1966. (Compl., ECF 1 at ¶¶ 22, 26). At the time of her termination, she was 58 years old. (*Id.*). Plaintiff has a long history of living with severe migraines that may cause stroke and death. (*Id.* at ¶ 28). She has been under the care of various neurologists or neuro ophthalmologists for at least 50 years. (*Id.* at ¶ 47). From October 2009 through January 2025, Plaintiff worked for Defendants, their predecessor, and/or their subsidiaries (collectively "Fitch") as an account manager and sales representative. (*Id.* at ¶¶ 27, 60).

#### *2. 2017: Plaintiff receives an accommodation and works remotely*

In September 2017, Plaintiff was offered and accepted a remote work accommodation from Fulcrum Financial, Fitch's predecessor. (*Id.* at ¶¶ 48, 54). After 2017, Plaintiff worked primarily from her Connecticut home and from the Defendants' New York City office "on occasion." (*Id.* at ¶ 27). In 2021, management at Fitch was "made aware" of Plaintiff's remote work accommodation. (*Id.* at ¶ 114).

---

[1] For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, (*see Krasner v. 2nd Ave Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007)) and draws all inferences in the Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

*3. 2019: Manish Aggarwal becomes Plaintiff's supervisor*

In June of 2017, Manish Aggarwal ("Aggarwal") joined Fitch as head of new product development. (*Id.* at ¶ 41). At an unspecified time in 2019, Aggarwal became the acting head of Plaintiff's account management and sale team. (*Id.* at ¶ 59). Plaintiff found it difficult to work with him and alleges, without additional detail, that he gave quality lead prospects to other males while his behavior towards her grew "more aggressive and horrible." (*Id.* at ¶¶ 59, 62, 67). While Plaintiff complained to senior management about Aggarwal four separate times in 2019, she pleads no facts that these complaints were related to her age, sex, or disability. (*Id.* at ¶ 91).

*4. 2020: Plaintiff requests FMLA*

In 2020, Plaintiff requested FMLA and short-term disability due to her migraines. (*Id.* at ¶ 108). She underwent two surgeries and went back to work after she had recovered. (*Id.* at ¶¶ 110-112).

*5. November 2021: Plaintiff complains about her issues with Aggarwal*

In November 2021, Plaintiff had lunch with Beau Kuhn ("Kuhn"), the Global Head of Sales for CreditSights, one of Fitch's subsidiaries. (*Id.* at ¶¶ 115-119). During this lunch, Plaintiff told Kuhn about "prior issues" she had had with Aggarwal. (*Id.* at ¶¶ 126-127). Plaintiff does not plead any issues in 2021 with Aggarwal. Aggarwal remained her manager until January 2022. (*Id.* at ¶ 150).

*6. December 2021: Plaintiff reminds Adam Spahn of her accommodation*

In December 2021, Plaintiff met with Adam Spahn ("Spahn")—whose role at that time is unclear—and reminded him that she worked from home. (*Id.* at ¶ 131). At some point in 2023, Spahn was one of the heads of the account management teams in the US. (*Id.* at ¶ 207).

*7. December 2021: Plaintiff tells HR her migraines are worsening*

In December 2021, Plaintiff spoke with Alex Pappas ("Pappas") from HR about her previous conversation with Spahn and told Pappas "in great detail" about her migraines and hospital stays. (*Id.* at ¶ 143).

*8. Plaintiff tells Pappas about Kuhn's comments regarding in-office work*

At unspecified times, Plaintiff told Pappas that Kuhn would make comments in meetings that everyone needed to be in the office. (*Id.* at ¶ 147). Pappas would then remind Kuhn that Plaintiff had an accommodation to work remotely. (*Id.* at ¶ 148). Plaintiff pleads no facts about Kuhn's position at that time or her relationship to her.

*9. 2022-2023: The "Citadel incident"*[2]

In 2022, while under the supervision of Marc Auerbach, Plaintiff was staffed onto the Citadel account. (*Id.* at ¶ 192). Plaintiff was only on the account for a short period of time before it was moved to Harry Broadbent ("Broadbent") in 2023. (*Id.* at ¶ 197). While under Broadbent's administration, Citadel informed him that they would be "combin[ing] all of the Fitch subscriptions and teams into one contracted subscription for a lesser amount." (*Id.* at ¶ 200).

[2] The Complaint does not address when in 2022-2023 this occurred.

Although Plaintiff denied having known anything about Citadel's plans, Defendants "attributed the loss of business to Plaintiff's book," but it is unclear when in 2023 this occurred or what was actually done to Plaintiff. (*Id.* at ¶¶ 202, 204, 208).

*10. 2023: Adam Spahn refers to a group of employees as "his boys"*

At an unspecified time in 2023, Spahn referred to a group of four male employees as "his boys." (*Id.* at ¶¶ 207, 222-223). Plaintiff alleges that this made her uncomfortable so "she kept her head down and kept walking past them". (*Id.* at ¶ 224). Plaintiff does not plead Spahn's job title or his relationship to her.

*11. 2023: Plaintiff's supervisor comments on her remote work accommodation*

In 2023, Plaintiff was placed under the management of Joseph Tafaro ("Tafaro"). (*Id.* at ¶ 225). As part of their supervision model, Tafaro and Plaintiff had weekly pipeline meetings in which Tafaro and Plaintiff discussed renewals and pricing. (*Id.* at ¶ 230). Tafaro made remarks on "multiple occasions" about Plaintiff's absence from the office, saying things like "if [Plaintiff] were in the office…" and would follow up by saying he was "just kidding" when Plaintiff reminded him of her accommodation. (*Id.* at ¶ 233). Plaintiff began going into the office once a month. (*Id.* at ¶ 242).

*12. 2024: Plaintiff's book of business*

By 2024, Plaintiff's book of business included 41 clients that she alleges had "no opportunity" for growth, nine with an opportunity for "small" growth, and eight that were going to be cancelled. (*Id.* at ¶235). Three of the remaining accounts had prospects for growth. (*Id*).

Plaintiff conclusorily alleges that "healthy young men" with "less experience" than she were getting "great clients" with "better opportunities for growth." (*Id.* at ¶237).

*13. February 2024: Access to "cheat sheets"*

In February 2024, Plaintiff was in the office and noticed several laminated sheets of paper on Tafaro's desk that made comparisons between Defendants' products, prices, and services and their competitors'. (*Id.* at ¶¶ 254, 255). When Plaintiff asked how she could get access to these "resources," Tafaro responded, "If you were in the office, you would of [sic] gotten this and other items like it." (*Id.* at ¶¶ 257, 258). Plaintiff does not plead facts to say whether she ever received access to these sheets, or who created and distributed them.

*14. 2024-2025: Harry Broadbent is promoted*

At an unspecified time in 2024, Broadbent, whom Plaintiff conclusorily describes as a "young man with no disabilities in his thirties" was promoted from account manager to sales director, then promoted to senior director in 2025 (*Id.* ¶ 229). Plaintiff does not say whether she and Broadbent were in comparable positions at this time.

*15. 2024: BTG Pactual US Capital deal*

At an unspecified time in 2024 Plaintiff was assigned to work on the contract with BTG Pactual, a large investment bank in South America, who had declined their renewal terms. (*Id.* at ¶¶ 328-327). Plaintiff worked with her London counterpart to identify a BTG Pactual team in Miami who relied on Fitch's products, mainly its CreditSights product. (*Id.* at ¶¶ 328, 332). BTG Pactual was then offered a renewal at a discount. (*Id.* ¶ 333). They renewed their CreditSights

subscription and expanded their CreditSights service to teams in Brazil, London, Spain, and Luxembourg. (*Id.* ¶ 337). Plaintiff pleads no facts regarding her relationship with this account after this instance.

*16. Early 2024: Plaintiff requests to work from Florida*

At the beginning of 2024, Plaintiff requested to work from Florida, where most of her clients were located, and was instructed to speak with HR. (*Id.* at ¶264). Plaintiff alleges that Mark Nugent, an account manager in his 60s, worked frequently from Florida and was not required to complete this process, building on Plaintiff's feelings of being "targeted." (*Id.* at ¶¶ 197, 266-267, 389). Plaintiff then began working from Florida, presumably without approval, for four weeks in March of 2024. (*Id.* at ¶268).

*17. August 2024: The training at Hearst Tower*

On August 6-7, 2024, Defendants held an in-person sales enablement training session at Hearst Tower in New York City. (*Id.* at ¶272). Remote workers were informed that they could attend the session remotely. (*Id.* at ¶274). Plaintiff attended remotely on the first day of the training, but then Tafaro privately messaged Plaintiff asking why she was not physically at the session, as senior management was "upset" with her absence. (*Id.* at ¶¶ 276, 278). Tafaro requested that Plaintiff attend the training in person the following day. (*Id.* at ¶280). Plaintiff relayed the conversation to HR, who reminded Tafaro that remote workers could join the session remotely; Tafaro then apologized to Plaintiff. (*Id.* at ¶¶282-284). Nonetheless, Plaintiff attended the second day of the training in-person. (*Id.* at ¶281).

*18. September 2024: Plaintiff is unable to travel to Texas*

In September 2024, Plaintiff relayed to Spahn in a meeting that her migraines were worsening and she would be unable to attend an upcoming client trip to Texas, but was willing to connect with the clients and reschedule the meetings remotely. (*Id.* at ¶¶308-310). Plaintiff provides no information regarding how her plan to hold her meetings remotely was received or whether she met with clients remotely.

*19. October 2024: Plaintiff is put on a performance improvement plan*

On October 11, 2024, Plaintiff was informed in a meeting with Tafaro and HR that she was being placed on a performance improvement plan ("PIP"). (*Id.* at ¶¶311-312). The PIP referenced the 2022 "Citadel incident", and the 2024 transaction with BTG Pactual, saying that Plaintiff had an issue of "suggesting to clients commercial proposals that impact other sales professionals' territories below acceptable commercial levels (BTG Pactual)." (*Id.* at ¶¶ 318, 324-340). Plaintiff disagreed with the PIP's account of these events and refused to sign the plan. (*Id.* at ¶¶314-315, 370). At an unspecified time, Plaintiff wrote to HR expressing her belief that the PIP was "incorrect and shocking" and "made it clear she was being targeted for being an older woman who works remotely." (*Id.* at ¶349). At an unspecified time later, Plaintiff wrote to Tafaro and HR denying the incidents the PIP referenced and expressing that she had concerns that she was experiencing "discriminatory conduct regarding her accommodation." [3] (*Id.* at ¶350). Shortly thereafter, Plaintiff had a call with Tafaro and HR, in which Tafaro allegedly expressed

[3] Plaintiff pleads no facts regarding what she said in this communication or why she believed the PIP was "discriminatory".

that he had no concern with Plaintiff's remote status. (*Id.* at ¶¶351-352). Plaintiff asserts that no additional discussions with her supervisors took place regarding the PIP. (*Id.* at ¶¶ 355-357). On November 8, 2024, HR allegedly told Plaintiff that she must sign the PIP. (*Id.* at ¶ 371). Plaintiff provides no facts about whether she signed the PIP. On December 3, 2024, Tafaro responded to Plaintiff's prior communication, saying that he had never discriminated against Plaintiff. (*Id.* at ¶ 375).

*20. Plaintiff tells Jessica Reiss and Tanja Feldmeier about the PIP*

At an unspecified time after she received the PIP, Plaintiff "discuss[ed] the details of the PIP" with Jessica Reiss ("Reiss").(*Id.* at ¶¶ 341, 343). Reiss was the head of Fitch's loan team and a long-time colleague of hers. (*Id.* at ¶¶ 341-342). Plaintiff also told Tanja Feldmeier ("Feldmeier"), who worked on the contracts team, "about what had transpired". (*Id.* at ¶¶ 72, 346-347).

*21. November 2024: Plaintiff requests medical leave*

On November 19, 2024, Plaintiff's medical team advised her to request "intermittent leave" so she could avoid working through migraines. (*Id.* at ¶ 378). On December 5, 2024, Plaintiff provided Defendants with medical leave paperwork. (*Id.* at ¶ 380). At an unspecified time later, her request was granted. (*Id.* at ¶ 404).

*22. November 2024: Plaintiff begins working with a new team*

On November 21, 2024, Plaintiff met remotely with her new team for 2025, including her new manager, Jason Liu. (*Id.* at ¶ 383). Plaintiff does not provide any facts regarding why she moved to a new team.

*23. December 2024: Plaintiff is offered a severance package*

During the first half of December, Plaintiff was offered a severance package by HR, should she not survive the PIP. (*Id.* at ¶¶ 391-393). Plaintiff rejected the offer, as she had begun working with a new team. (*Id.* at ¶¶ 396-398).

*24. January 2025: Plaintiff is terminated from her job*

On January 6, 2025, Plaintiff was terminated in a virtual meeting with Tafaro and HR, during which Tafaro said she was being "terminated for the PIP." (*Id.* at ¶¶ 405-406). Up until her termination, Plaintiff and Tafaro had continued their weekly pipeline meetings. (*Id.* at ¶¶311-312). Tafaro was not her manager at this time and Plaintiff does not plead facts about his position or relationship to her at this time. Plaintiff also does not plead whether she ever agreed to the PIP or undertook to comply with any steps in the PIP.

*25. 2025: Defendant promotes Dalton Field*

At an unspecified time around Plaintiff's termination, Defendants promoted Dalton Field ("Field"). (*Id.* at ¶ 416). While Plaintiff asserts that Field was an account manager, Plaintiff does not explain whether she also applied for the same promotion or how Field's promotion related to her or her termination.

**B. Procedural History**

Plaintiff filed her complaint on July 29, 2025. (ECF 1). On October 6, 2026, Defendants moved to dismiss pursuant to Fed. R. Civ. P. 8(a), 12(b)(1), and 12(b)(6). (ECF Nos. 27 and 28). Defendants move to dismiss the federal claims on the grounds that Plaintiff pleads no facts

supporting an inference that Plaintiff's termination was discriminatory or that she engaged in protected activity. (Def. Mem. Of Law, ECF 28 at 14). On November 5, 2025, Plaintiff filed her memorandum of law in opposition to the motion to dismiss and asked for leave to amend should the Court find any deficiency in her pleadings, although no proposed amended complaint was submitted with her opposition. (Pl's. Mem. Of Law., ECF 33 at 39). On November 19, 2025, Defendants filed their reply memorandum of law in support of their motion to dismiss. (ECF 37).

## III. LEGAL STANDARD

### *1. Motion to Dismiss*

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. Id. "'[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.*, 930 F. Supp. 2d 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss. . ..").

*2. Adverse Employment Action*

"A plaintiff sustains an adverse employment action if . . . she endures a materially adverse change in the terms and conditions of employment." *McSweeney v. Cohen*, 776 F.Supp.3d 200, 236 (S.D.N.Y. 2025) (quoting *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 85 (2d Cir. 2015)). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). A termination is an adverse employment action. *Ashcroft*, 336 F.3d 138. ("Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.") (alteration and internal quotation marks omitted).

## IV. DISCUSSION

### A. Timeliness of the Federal Claims (Title VII, the ADA, and the ADEA)

Title VII, the ADA, and the ADEA require a plaintiff to file an Equal Employment Opportunity Commission ("EEOC") charge within 300 days of the alleged discrimination. *See Griffith v. Gallagher*, 33 F. App'x 15, 16 (2d Cir. 2002) (Title VII, ADA, and ADEA). "Title VII and the ADA require [] a plaintiff to first exhaust her administrative remedies before filing suit in federal court." *Anderson v. City of New York*, 712 F. Supp. 3d 412, 425 (S.D.N.Y. 2024) (citing 42 U.S.C. § 2000e-5(e)); 42 U.S.C. § 12117(a); *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006). "Exhaustion requires timely filing of charges with the EEOC and obtaining notice of the right to sue." *Id.* (citations omitted).

In this case, Plaintiff received notice of termination on January 6, 2025. Plaintiff then filed a joint filing with the EEOC and New York State Division of Human Rights ("NYSDHR") complaint on April 17, 2025. (Compl., ECF 1 at ¶18). She received her Notice of Right to Sue letter on June 6, 2025, which gave her 90 days within receipt of the notice to commence her lawsuit. On July 29, 2025, Plaintiff timely filed suit in the Southern District of New York. (*Id.*). Accordingly, any Title VII, ADA, or ADEA claims that accrued before June 21, 2024—300 days before Plaintiff filed her EEOC claim on April 17, 2025—are time-barred because they were not exhausted.

### B. Plaintiff Fails to Allege Age Discrimination Under the ADEA

The ADEA prohibits the refusal to hire people over 40 years of age, based on their age. 29 U.S.C. 623(a); 29 U.S.C. 631(a). In order to sufficiently plead a prima facie age discrimination case, Plaintiff must plead that: (1) she is a member of the protected group, (2) she was qualified

for the position, (3) she experienced an adverse employment action, and (4) the adverse action resulted from circumstances providing an inference of discrimination. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012). The parties do not dispute that Plaintiff was over 40 years old and that she was qualified for the position.[4]

Plaintiff alleges that she was terminated because of her age or, in the alternative, alleges that Defendants' policies and practices disproportionately impacted her. (*Id.* at ¶¶ 421-425).

*1. Plaintiff Does Not Plead Disparate Impact*

A plaintiff sufficiently pleads disparate impact under the ADEA by: (1) identifying a specific, facially neutral employment practice or policy; (2) demonstrating that a disparity exists; and (3) establishing a causal relationship between the two. *Allen v. City of New York,* No. 24-2589-CV, 2025 WL 3152723 *2 (2d Cir. Nov. 12, 2025) (summary order) (quoting *Geller v. Markham*, 635 F.2d 1027, 1032 (2d Cir. 1980) (ADEA)). In order to bring a disparate impact claim, a plaintiff cannot "merely alleg[e] a disparate impact, or point[] to a generalized policy that leads to such an impact." *Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84, 100 (2008) (alteration omitted) (citation omitted). Rather, the plaintiff must "isolat[e] and identif[y] the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Id* (emphasis in original). Plaintiffs typically rely on statistical evidence to show that a disparity exists. *Mandala v. NTT Data, Inc.,* 975 F.3d 202, 209 (2d Cir. 2020). At the motion to dismiss stage, a plaintiff need not detail the soundness of her methodology nor must she provide corroborating

[4] Def. Mem. Of Law, ECF 28 at 17 does not contest that Plaintiff was over 40 years old or that she was qualified for the position.

evidence; however, the statistics must plausibly suggest that the challenged practice actually has a disparate impact. *Id.* at 209-10.

If Plaintiff is claiming she was subject to disparate impact, she pleads no facts regarding any facially neutral policy, no allegations of a statistical analysis showing a disparate impact, and pleads no causation.

*2. Adverse Employment Action*

In addition to her termination, Plaintiff also alleges that she was subject to "adverse action" by way of being "overlooked for promotion in favor of less qualified younger employees, provi[ded] [] less favorable accounts, and harass[ed]" (Compl., ECF 1 at ¶52). Her allegations that she was overlooked for promotion, given less favorable accounts, and harassed are conclusory and lack adequate, if any facts, to support her allegations. They cannot support a claim of an adverse employment action for an age discrimination claim.

*3. Plaintiff Does Not Adequately Allege Circumstances Supporting an Inference of Discrimination*

Plaintiff must also plead that she suffered the adverse employment action, in this case, her termination, *because* of her age. *Vega* 801 F.3d 87. Facts such as explicit comments expressing ageist views, evidence of more favorable treatment towards similarly situated younger employees, or a clear statistical pattern of unfavorable adverse action taken towards older employees all serve as satisfactory proof to provide an inference of discrimination. *Del Valle v. City of New York*, No. 11-CV-8148 (DLC), 2013 WL 444763, at *4 (S.D.N.Y. Feb. 6, 2013).

Plaintiff alleges three facts to support her claim of an inference of age (and sex) discrimination: (1) the promotion of Harry Broadbent, whom Plaintiff conclusorily describes as a "young man with no disabilities in his thirties," at an unspecified time in 2024 (Compl., ECF 1 at ¶ 229)[5]; (2) Plaintiff's conclusory allegations that healthy young men with less experience than she were "getting great clients with excellent opportunities" (*Id.* at ¶ 237); and (3) and the promotion of Dalton Field, whom Plaintiff conclusorily alleges was "far younger, less qualified, and less successful." (*Id.* at ¶ 416). Conclusory allegations that younger employees got better opportunities or promotions do not suffice to adequately make out Plaintiff's claims. *Munoz-Nagel v. Guess, Inc.,* No. 12-CV-1312 (ER), 2013 WL 1809772, at *7 (S.D.N.Y. Apr. 30, 2013) ("Although Plaintiff is entitled to plead facts upon information and belief, ... because Plaintiff has pointed to no information that would render her 'belief that younger applicants were hired over her anything more than a conclusory assertion, the Court finds that she has failed to state a claim under the ADEA.")

Although not necessary for the disposition of this claim, Plaintiff has failed to plead if or how Broadbent, Field, or other "healthy young men" were similarly situated. "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (citation omitted). Plaintiff additionally fails to explain how the facts above lead to an inference of discrimination other than by conclusory statements stating that they do. (Compl., ECF 1 at ¶¶ 423-426); *Iqbal*, 556 U.S. 678 (2009) ("Threadbare

[5] Because Plaintiff does not specify when in 2024 Broadbent was promoted, this allegation may also be time-barred.

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief].") Because Plaintiff fails to plead facts supporting an inference of age discrimination, her ADEA claim is dismissed.

**C. Plaintiff Fails to Allege Sex Discrimination Under Title VII**

To state a *prima facie* case of discrimination under Title VII, a plaintiff must plead facts showing "'(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (quoting *Holcomb v. Iona Coll*., 521 F.3d 130, 138 (2d Cir. 2008)). To survive a motion to dismiss, a plaintiff must plausibly allege that her "race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega* 801 F.3d 86.

Plaintiff alleges that she was subjected to disparate treatment on the basis of her gender and that she suffered seven different adverse employment actions based on her sex. (Compl., ECF 1 at ¶¶ 481-484). Plaintiff sufficiently alleges that she belongs to the protected class and neither party contests that Plaintiff was qualified for the position. (*Id.* at ¶¶ 26, 420).[6]

*1. Adverse Employment Action*

Plaintiff's Complaint alleges seven different "facts" related to sex discrimination; that Defendants: "(1) treated male colleagues better than the Plaintiff; (2) scheduled male colleagues to preferred accounts and assignments; (3) expressed a direct preference for working

[6] Def. Mem. Of Law, ECF 28 at 20 does not contest that Plaintiff was qualified for the position.

with male employees as opposed to female employees; (4) determined credibility of females to be less than that of males; (5) disciplined Plaintiff while not disciplining males; (6) promoted less qualified males over Plaintiff; and (7) terminated Plaintiff in favor of similarly-situated males who were equally or less qualified and experienced than the Plaintiff." (Compl., ECF 1 at ¶ 484).

These conclusory statements do not support an inference of sex or gender discrimination. Plaintiff pleads no facts that speak to how or when unspecified male colleagues were treated better than she or what that alleged "better treatment" entailed. Nor does she plead facts regarding what these allegedly preferred accounts and assignments were or when this scheduling occurred. Plaintiff additionally does not plead facts that Defendants expressed a direct preference for working with male employees as opposed to female employees. The only fact Plaintiff does plead about male employees is that at an unspecified time in 2023, Spahn, one of the heads of the US account management team, referred to a group of four male employees as "his boys." (*Id.* at ¶¶ 207, 222-223). There is no pleading that Spahn expressed a preference for working with this group of employees or male employees generally (and this fact is time-barred). Plaintiff additionally pleads no facts to support an inference that Defendants made differential credibility determinations or disciplined men differently from Plaintiff (or other women). While Plaintiff makes conclusory statements about the qualifications of Field and other male employees, she pleads no *facts* regarding their qualifications or that she was eligible or applied for those same promotions.[7] While Plaintiff was terminated, she pleads no facts that any unspecified males were actually similarly situated or that they were equally or less qualified

[7] Plaintiff makes conclusory allegations that healthy young men with less experience than she were "getting great clients with excellent opportunities" (Compl., ECF 1 at ¶ 237) and conclusorily alleges that Dalton Field was "far younger, less qualified, and less successful." (*Id.* at ¶ 416).

and experienced, except through conclusory statements, nor does she suggest that her role was taken by a man.[8]

### 2. *Plaintiff Does Not Adequately Allege Circumstances Supporting an Inference of Discrimination*

If a plaintiff has suffered an adverse employment action, a plaintiff "need only plausibly allege facts that provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Vega* 801 F.3d 86-87. (internal citations and quotations omitted). A plaintiff may plead discrimination either indirectly by "showing that the employer's stated reason for its employment action was pretext to cover-up discrimination" or by otherwise creating a "mosaic" of intentional discrimination by identifying "bits and pieces of evidence that together give rise to an inference of discrimination". *Vega* 801 F.3d 86. (internal citations and quotations omitted).

Plaintiff concludes, without more, that she was she was "discriminated against based on her sex in that she was subjected to disparate treatment based on her gender as a female." (Compl., ECF 1 at ¶ 481); *Iqbal*, 556 U.S. 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]"). Plaintiff again cites to the same three post-June 2024 facts she cites (unsuccessfully) to support of an inference of age discrimination, and for the same reasons: (1) Broadbent's promotion sometime in 2024 (Compl., ECF 1 at ¶ 229)[9]; (2) "healthy young men with less experience than she" were "getting great clients with excellent opportunities" (*Id.* at ¶ 237); and

[8] *Id.*

[9] Because Plaintiff does not specify when in 2024 Broadbent was promoted, this allegation may also be time-barred.

(3) Field was promoted, whom Plaintiff claims was "far younger, less qualified, and less successful." (*Id.* at ¶ 416). Plaintiff pleads no facts to suggest that any of these male colleagues were similarly situated. *Sank v. City Univ. of N.Y.,* 2011 WL 5120668, at *11 (S.D.N.Y. Oct. 28, 2011) ("Absent allegations plausibly suggesting that the male colleagues who purportedly received superior treatment were similarly situated to [plaintiff] in all relevant respects ... [plaintiff]'s conclusory assertions of differential treatment do not permit a plausible inference of gender discrimination"). Accordingly, Plaintiff's sex and gender discrimination claims are also dismissed.

**D. Plaintiff Fails to Allege Disability Discrimination Under the ADA**

To survive a motion to dismiss a federal disability discrimination claim under the ADA, Plaintiff must have pleaded facts that, if true, lead to a plausible inference that: "(1) the defendant is a covered employer; (2) the plaintiff suffered from, or was regarded as suffering from, a disability within the meaning of the statute; (3) the plaintiff was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability or perceived disability." *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 566–67 (S.D.N.Y. 2023) (quoting *Dobbs v. NYU Langone Medical Ctr.*, No. 18-CV-1285 (MKV), 2021 WL 1177767, at *5 (S.D.N.Y. Mar. 29, 2021)).

A covered entity is defined to include an "employer," 42 U.S.C. § 12111(2), which in turn is defined to include a "person engaged in an industry affecting commerce who has 15 or more employees." *Id.* § 12111(5)(A); *Mary Jo C. v. New York State & Loc. Ret. Sys.,* 707 F.3d 144, 167 FN 9 (2d Cir. 2013). Under the ADA, a plaintiff must plead facts demonstrating that he or she

suffers from a "disability": i.e., a "physical ... impairment ... that substantially limits one or more [of plaintiff's] major life activities." 42 U.S.C. § 12102(1)(A); see *Hamilton v. Westchester Cnty*., 3 F.4th 86, 92 (2d Cir. 2021)

While Plaintiff alleges that Defendants are a covered entity under the ADA without providing information about the number of employees at Fitch, Defendants do not dispute that they are a covered entity. (Compl., ECF 1 at ¶ 587); (Def. Mem. Of Law, ECF 28 at 23). Plaintiff alleges that she is "disabled due to severe migraines that may result in stroke and death." (Compl., ECF 1 at ¶ 28). Plaintiff does not provide details about how the migraines substantially limit one or more of her major life activities, but Defendants also do not dispute that they regarded her as suffering from a disability.[10] (Def. Mem. Of Law, ECF 28 at 23). Defendants also do not dispute that she was qualified to perform the essential functions of her role or that she was terminated in 2025. (*Id.*).

*1. Adverse Employment Action*

The only adverse employment action pleaded is her termination. To the extent that Plaintiff claims "abuse", these allegations are unsupported by any factual allegations and cannot support a disability discrimination claim.

[10] But *see Philbert v. New York City Dep't of Educ.,* 2024 WL 756362 (S.D.N.Y. Feb. 23, 2024), *aff'd,* No. 24-804, 2025 WL 3251187 (2d Cir. Nov. 21, 2025) (at summary judgment, finding that Plaintiff had not proven that her migraines were a disability under the ADA because she did not plead specific facts about how her migraines substantially limited one or more major life activity).

*2. Plaintiff Does Not Adequately Allege that she Suffered an Adverse Employment Action Because of her Disability*

In order to plead that her termination was motivated, at least in part, by disability discrimination, Plaintiff pleads the following facts: 1) Tafaro (mistakenly) told Plaintiff she had to attend the second day of Hearst Tower training in-person (Compl., ECF 1 at ¶¶ 272-285); (2) Plaintiff was put on a PIP on October 9, 2024, that she claims was "discriminatory" (*Id.* at ¶¶311-312); and (3) Plaintiff was terminated on January 6, 2025. (*Id.* at ¶¶ 405-406).[11] *Vega*, 801 F.3d at 87 (on a motion to dismiss, Plaintiff has only to plausibly allege that "the employer took adverse action against her at least in part for a discriminatory reason... by alleging facts that directly… or indirectly show discrimination by giving rise to a plausible inference of discrimination."); *see also Dooley v. JetBlue Airways Corp*., 636 Fed. Appx. 16, 21 (2d Cir. 2015) (applying this standard to ADA discrimination claims).

"To determine whether a particular comment is probative of discriminatory animus or is a mere 'stray remark,' a court considers: '(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decision-making process." *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) (cleaned up) (quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004)).

[11] Plaintiff's motion papers also cite the February 2024 comments about access to cheat sheets and comments she received about her presence in the office. The comments about access to the cheat sheets are time-barred and the comments about her presence in the office are additionally time-barred as some incidents occurred in 2023. Plaintiff provides no information about whether any other comments about her presence in the office occurred in 2024 and if so, when in 2024 they occurred.

The fact of Plaintiff's termination cannot serve as both the adverse employment action and evidence of animus. This is circular. Similarly, Plaintiff's allegation that the PIP was "discriminatory," again without facts to suggest that it was, is also a bare conclusion and also circular. This leaves Tafaro's comment, after Plaintiff attended the first day of the Hearst Tower training remotely, that she should attend the next day in person. As soon as she told HR that she was permitted to attend remotely, HR confirmed the same and Tafaro apologized for his remark. (Compl., ECF 1 at ¶¶ 276, 278, 280, 282-284). There is no suggestion that Tafaro's remark was motivated by discriminatory animus. Moreover, by the time of her termination, five months later, Tafaro was no longer Plaintiff's supervisor. This single remark,[12] that did not implicate her disability, five months before her actual termination, is not sufficient to support an inference of discrimination. *Shlafer v. Wackenhut Corp.,* 837 F. Supp. 2d 20, 27 (D. Conn. 2011) (holding two-month temporal proximity between notifying employer of COPD diagnosis and termination sufficient to defeat motion to dismiss)*; see Powell v. Merrick Acad. Charter Sch.,* 16-CV-5315 (NGG) (RLM), 2018 WL 1135551, at *6 (E.D.N.Y. Feb. 28, 2018) (holding one-month temporal proximity "easily close enough to raise an inference of discrimination"). Accordingly, Plaintiff's disability discrimination claim is dismissed.

### E. Plaintiff Fails to Allege a Hostile Work Environment Under Title VII

To state a claim for a hostile work environment under Title VII, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her]

[12] Even if Tafaro's prior comments about Plaintiff's remote work were not time-barred, they are still too attenuated, even considered together, to support an inference of discrimination.

employment and create an abusive working environment." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320-21 (2d Cir. 2015) (internal quotation marks omitted) (citations omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Bermudez v. City of New York,* 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

Plaintiff does not plead sufficient facts to support a hostile work environment claim because the conduct about which Plaintiff complains is neither severe nor pervasive. Plaintiff's hostile work environment claim is that Tafaro "continued the pattern of further discriminatory treatment and ultimately terminate[d] [Plaintiff] on a pretense." (Compl., ECF 1 at ¶ 555). Plaintiff alleges only the following facts: (1) Tafaro told her that she had to attend the Hearst Tower training in-person (Compl., ECF 1 at ¶¶ 272-285); (2) Tafaro and HR held a meeting with her and put her on a PIP (*Id.* at ¶311-312); (3) she and Tafaro continued their weekly pipeline meetings. (*Id.* at ¶311-312); and (4) her termination (*Id.* at ¶405-406).

None of this conduct is objectively severe or pervasive enough that a reasonable person would find it hostile or abusive. Plaintiff pleads nothing about the pipeline meetings, PIP, or termination other than they happened. She pleads nothing about the tone or tenor of any of these actions to suggest any hostility or reference to her sex. While Plaintiff's subjective experience of her interactions with Mr. Tafaro during the relevant time period, which she characterizes as "rife with… outright hostility and aggression," might support the subjective component, a finding of a hostile work environment demands more. (Pl's. Mem. Of Law., ECF 33 at 23). Accordingly, this claim is also dismissed.

**F. Plaintiff's Retaliation Claims Fail**

To adequately plead a *prima facie* case of retaliation, Plaintiff must allege facts that plausibly suggest that (1) she participated in a protected activity; (2) Defendants knew of the protected activity; (3) Defendants took an adverse employment action against Plaintiff; and (4) a causal connection exists between the protected activity and the adverse employment action. *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (Title VII); *Witcher v. New York City Dep't of Educ*., No. 23-CV-0465, 2024 WL 3220264, at *2 (2d Cir. June 28, 2024) (summary order) (ADA). In addition, under the FMLA, Plaintiff must allege that she engaged in protected activity by exercising rights in line with FMLA and that she was qualified for her position. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d. Cir. 2004).

*1. Protected Activity*

"A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.'" *Kouakou v. Fideliscare New York,* 920 F. Supp. 2d 391, 400 (S.D.N.Y. 2012). To

constitute a protected activity, an informal complaint must be sufficiently specific to make it clear that the employee is complaining about statutorily prohibited conduct. *See, e.g., Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006)

The only protected activity Plaintiff sufficiently pleads is the exercise of her FMLA rights. Although Defendants dispute that she exercised rights under the FMLA when she sought leave, (Def. Mem. Of Law, ECF 28 at 31), Plaintiff has sufficiently pleaded that she submitted paperwork to Defendants requesting FMLA leave on December 5, 2024, and that at some time later, that leave was granted. (Compl., ECF 1 at ¶¶ 404, 380, 773). *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 469 (S.D.N.Y. 2023) ("In order for a plaintiff to 'exercise rights protected under the FMLA,' the plaintiff must demonstrate she actually has a valid claim to FMLA benefits.") (citation omitted).

Plaintiff's remaining allegations about engaging in protected activity are insufficient. At best, she alleges that: she complained to Kuhn in 2021 about unspecified "prior issues" with her then-supervisor[13]; told Spahn in 2021 that she worked from home[14]; told HR about worsening migraines in 2021, and that Kuhn and Tafaro had each made remarks asking or suggesting Plaintiff come to work in person[15]; told Spahn about worsening migraines in 2024[16]; told coworkers about the PIP[17]; and complained to HR alleging only that she "made it clear " she

[13] Compl., ECF 1 at ¶ 126. This incident is likely time-barred, as it occurred in 2021.
[14] *Id.* at ¶ 131. This incident is likely time-barred, as it occurred in 2021.
[15] *Id.* at ¶¶ 142, 147. The migraines incident is likely time-barred, as it occurred in 2021 and her telling HR about Kuhn and Tafaro's comments about remote work may also be time-barred since there are no dates attached to those instances.
[16] *Id.* 1 at ¶ 126. This incident may be time-barred, as it occurred at an unspecified time in 2024.
[17] *Id.* 1 at ¶¶ 341, 346.

believed she was being "targeted for being an older woman who works remotely." (Compl., ECF 1 at ¶ 349).

Other than her complaints about the PIP, Plaintiff pleads no facts about these incidents that suggest that she engaged in activity protesting discrimination. Her complaints to her coworkers about other coworkers, her migraines, and her ongoing ability to work remotely (years after the request was granted) are not complaints of discrimination to her employer of which her employer was aware. Nor has Plaintiff alleged facts to suggest that these remarks were made in opposition to "an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing" or requesting an accommodation. See *Rosich v. LaSalle Acad*., No. 1:24-CV-09183 (JLR), 2025 WL 2410596 *11 (S.D.N.Y. Aug. 20, 2025) (collecting cases).

Even her complaints about being put on a PIP are insufficient. Although Plaintiff alleges she "made clear" that she objected to the PIP because she wrote to HR expressing so and "made it clear she was being targeted for being an older woman who works remotely," in the same paragraph she also pleads that she told HR "how incorrect and shocking the PIP was." (Compl., ECF 1 at ¶349). This may not have fairly put her employer on notice that she was protesting or opposing discriminatory conduct, as opposed to complaining generally about being put on a PIP. *Areu v. Fox News Network, LLC*, No. 20-CV-8678 (RA), 2021 WL 4124226 (S.D.N.Y. Sept. 9, 2021) * 15 (dismissing for insufficiently pleaded protected activity where Plaintiff pleaded that "she refused to 'play along' with [Sean] Hannity's 'misogynistic' behavior," but alleged "no facts that indicate that she in fact did so."); *Batiste v. City Univ. of N.Y.*, No. 16-CV-3358 (VEC), 2017 WL 2912525, at *10 (S.D.N.Y. July 7, 2017) ("Complaining about general unfairness,

unaccompanied by any indication that plaintiff's protected class status caused the unfairness, does not qualify as protected activity") (citing, *inter alia, Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107-08 (2d Cir. 2011)); *Cf. Bass v. NYNEX,* No. 02-CV-5171 (DLC), 2004 WL 1941088 (S.D.N.Y. Sept. 1, 2004) (general claims that PIP was "unfair" "did not provide notice that Bass believed he was the subject of discrimination and therefore do not constitute protected activity").

*2. Adverse Employment Action*

As discussed infra, Plaintiff's conclusory allegations that she was "denied opportunities" and "preferred assignments," "harassed," and that nondisabled employees were "given preference" are too vague and conclusory to support an adverse employment action. (Compl., ECF 1 at ¶¶ 640, 696). Being placed on a PIP is also not an adverse employment action. *Dries v. Smith & Nephew, Inc.,* No. 25-925, 2026 WL 912615 *2 (2d Cir. Apr. 3, 2026) ("More fundamentally, we have previously observed that actions similar to the mere imposition of a PIP do not rise to the level of an adverse employment action") (collecting cases). At most, Plaintiff's termination is an adverse employment action. Plaintiff must next plead facts to infer a causal connection between alleged protected activity and her termination.

*3. Plaintiff Fails to Allege a Causal Connection Between the Protected Activity and the Adverse Employment Action*

Even if Plaintiff's references or complaints to HR about Tafaro's comments about remote work or asking her to attend the Hearst Tower training in person were construed as protected activity, Plaintiff has failed to allege a causal connection between those remarks and her termination. As discussed previously, if Plaintiff came to work once a month in person, and she

alerted HR and refused Tafaro's request to attend the Hearst Tower training, she has not pleaded that her employer knew that she was engaging in protected activity. In any event, Plaintiff has pleaded no direct evidence of retaliatory animus or that her PIP or termination followed closely after the Hearst Tower training.[18] *Sharikov v. Philips Med. Sys. MR, Inc.,* 103 F.4th 159, 170 (2d Cir. 2024) ("Causation may be shown either through direct evidence of retaliatory animus or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment.") Even if Plaintiff's complaints about her PIP being discriminatory rise to the level of protected activity, she has not pleaded that her termination was the result of her complaint about the PIP and not, for example, her refusal to sign it.

And finally, while Plaintiff requested medical leave one month before her termination, she was simultaneously on a PIP (that she had refused to sign) and had already been offered a severance package. *See Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (intervening events undermine temporal inference of causal connection). Other than her conclusory allegations that she was terminated in retaliation for exercising her rights under the FMLA, Plaintiff fails to plead any causal connection between any alleged protected activity and her termination. Accordingly, Plaintiff's federal retaliation claims are dismissed. *Cale v. Mount Sinai Business Health* No. 23-CV-3072 (RA), 2025 WL 919478 *7 (S.D.N.Y. Mar. 26, 2025), appeal dismissed (Aug. 7, 2025) (plaintiff's retaliation claim cannot succeed where "she provides no direct evidence to support [her] claim other than her own conclusory testimony).

---

[18] Indeed, although not dispositive here, the PIP and the termination reference Plaintiff's performance. (Compl., ECF 1 at ¶¶ 326).

### G. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's State and Municipal Claims

A district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quotations omitted). In general "where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006).

Here, the Court has dismissed all of Plaintiff's federal law claims. This case does not present any facts that make it an exception to this general rule and as such, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state and municipal law claims unless and until there is a complaint with adequately pleaded federal claims. *See Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 107 (S.D.N.Y. 2023) (declining to extend supplemental jurisdiction over the plaintiff's NYSHRL claims after dismissing the federal claims); *Garcia v. Marc Tetro, Inc.,* No. 18-CV-10391 (VEC), 2020 WL 996481, at *3-4 (S.D.N.Y. Mar. 2, 2020) (declining to extend supplemental jurisdiction over New York City Human Rights Law claim in part because it "requires a separate analysis from that of Title VII").

**H. Plaintiff is Directed to File a Motion to Amend**

Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts "ha[ve] broad discretion in determining whether to grant leave to amend." *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). But leave need not be granted if amendment would be futile. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).") Here, Plaintiff's conclusory assertions that she was terminated on the basis of her age, sex, or disability are likely futile. There is some question, however, whether Plaintiff's complaint about being put on the PIP constituted protected activity to support a retaliation claim, and then, whether the circumstances of Plaintiff's termination lead to a plausible inference that her termination was <u>because</u> she complained that the PIP was discriminatory, and not because (for example) of her job performance or because she refused to comply with the PIP. Similarly, Plaintiff has only pleaded conclusions to support her FMLA retaliation claims.

Accordingly, if Plaintiff seeks to amend her complaint, she may do so by filing a motion to amend together with a proposed amended complaint, by **October 23, 2026**. Plaintiff is reminded that: 1) she must plead facts, not conclusions; and 2) if she seeks to include facts occurring before June 21, 2024, she must also show – by citing case law in her motion to amend – that there is a basis for relation back. Plaintiff should focus her efforts on her retaliation claims consistent with this Opinion. The Court is of the mind that the only claim that might not be futile is the claim that Plaintiff was terminated in retaliation for complaining that her PIP was imposed in a discriminatory manner, so she should focus on pleading whether her complaints

about the PIP lead to a plausible inference that 1) she engaged in protected activity, ***and*** 2) that she was terminated because of that allegedly protected activity, and not for some other reason. All discovery is **STAYED** pending a decision on Plaintiff's motion to amend, if she chooses to file one.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in its entirety.** If Plaintiff elects to file a motion to amend, she must do so by **October 23, 2026,** and attach her proposed amended complaint. All discovery is **STAYED** pending a decision on Plaintiff's motion to amend, if she chooses to file one. If the parties wish to pursue or renew settlement discussions, they should contact Judge Moses as soon as possible.

The Clerk of Court is respectfully directed to close ECF 27, and all outstanding discovery motions at ECF Nos. 56, 60, 68, and 76.

**SO ORDERED.**

*_/s/ Ona T. Wang_*
**Ona T. Wang**
United States Magistrate Judge

Dated: September 28, 2026
New York, New York